UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————————

WILLIAM J. WISE,

        Petitioner,

    -v-                             08-CV-6312(MAT)
                                              **ORDER**

SUPERINTENDENT OF ATTICA
CORRECTIONAL FACILITY,

        Respondent.

———————————————————————

## I.    Introduction

*Pro se* petitioner William J. Wise ("petitioner") has filed a timely petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction in Livingston County Supreme Court of Manslaughter in the First Degree (N.Y. Penal L. § 120.25(1)) following a bench trial before Justice Raymond E. Cornelius. Petitioner was sentenced as a second felony offender to a determinate term of imprisonment of twenty-five years with five years of post-release supervision.

## II.  Factual Background and Procedural History

### A.   Trial and Verdict

#### 1.   The Prosecution's Case

On the night of January 21, 2006 Amy Sayle ("Sayle" or "the victim") attended a party at the Powers Inn Club in Dansville, New York, with petitioner, whom she had dated.  According to a patron who was at the Club that night, petitioner watched Sayle's "every

move" as she played pool with other men. Sayle then left the club with petitioner. She was not seen alive again, except by the petitioner. T. 105, 108-09.[1]

The following Monday when Sayle did not show up for work, her co-workers contacted the Livingston County Sheriff's Department. T. 128, 130. When police arrived at Sayle's house at approximately 1:00pm, they found petitioner inside the home, drunk and asleep on Sayle's first-floor sofa. T. 126-30. Petitioner told Sheriff's Deputy Michael Yencer ("Yencer") that he had taken Sayle to work earlier that morning, at approximately 7:45am. When Yencer informed petitioner that Sayle had not reported to work, petitioner then stated that he actually dropped her off at a gas station near her place of employment. T. 130. Yencer observed that petitioner's breath smelled of alcohol and his speech was slurred. T. 131.

Yencer then requested to go upstairs to see if Sayle had possible returned home while petitioner was asleep. Petitioner reluctantly gave him permission. T. 132-33. As Yencer approached the upstairs bedroom, he smelled the odor of a decomposing body. He then found Sayle's naked body, lying face down under a comforter on the bedroom floor. T. 133, 142, 162, 183-84. Also in the room were various "sex toys," including a cord and a riding crop. T. 197. Petitioner told Yencer that he and Sayle had a party on Saturday night. T. 134.

---

[1] Citations to "T.__" refer to the trial transcript; citations to "S.__" refer to the sentencing transcript.

Soon thereafter, petitioner was interviewed by the Livingston County Sheriff's Department, telling the investigator that he and Sayle were friends, and had known each other for about two years. T. 150-51. Initially, petitioner said that he arrived at Sayle's house at 7:30am Monday morning and drove Sayle to the gas station near her workplace. T. 151. After dropping Sayle off, petitioner went out drinking for a few hours, and arrived back at her house around 11 or 11:30am. T. 152-53, 158. The vice president of the Powers Club Inn confirmed that petitioner arrived back at the Club around 10:00am on Monday, January 23, and had several vodka drinks. Petitioner told her that he had been drinking all weekend, and that he "had something to do Saturday," that he had done it, and that he could not tell her what it was and that she should not ask. T. 290-300.

Petitioner explained to the investigator that he and Sayle had gone to a party on Saturday night at the Powers Inn Club, after which he dropped Sayle off at her house. Petitioner returned to the club, went to a friend's house afterward, and did not return to Sayle's house until 2 or 2:30am when he went to sleep on her couch. T. 151-153-54. Petitioner then changed his story, telling the investigator that he had, in fact, stayed at Sayle's house since Saturday before the party, but that he had not spoken to her on Sunday because they were arguing on Saturday night. T. 153-54. He

also acknowledged that he "stays with [Sayle] and sleeps with her on the weekends." T. 154.

Sayle was pronounced dead at 4:25pm on Monday, January 23, 2006. The coroner believed that she had been dead for at least 24 hours. T. 159-67. The following day an autopsy was performed, which indicated that Sayle had sustained numerous injuries, including contusions around her eyes, inside her mouth, and on her right arm, as well as ligature marks and contusions on both wrists, bruising on both thighs, abrasions on the left knee, and what appeared to be bite marks on her breasts. T. 48, 78. According to the coroner, those injuries occurred prior to her death, with the actual cause of death being asphyxiation. He noted that the hemorrhages on the eyes and face indicated pressure or force applied against the mouth. T. 48, 80-92, 99-100.

At petitioner's trial, a forensic biologist testified that DNA consistent with petitioner's DNA had been found on nail clippings from the victim's left hand and also in the form of saliva on petitioner's breasts. There was however, additional DNA from an unknown male in the right hand nail clippings and on the victim's breasts. T. 220, 241-44, 254-55, 258-60.

On October 24, 2006, while petitioner was being booked at Livingston County Jail, Sheriff's Deputy Andrew Eichhorn observed "fresh" red marks "that appeared to be scratches" on petitioner's right hip. T. 318-21.

While incarcerated, petitioner made statements to fellow inmates at the jail. Timothy Lotz ("Lotz") inquired of petitioner how the victim had died, to which petitioner responded by holding a hand over his mouth. Lotz asked petitioner whether that meant she died by suffocation or asphyxiation and petitioner responded by saying "yes." Petitioner also told Lotz that when he discovered Sayle's body, he covered her up with a blanket because she was naked. He also told Lotz that he did not call 911 because he was nervous. T. 331-34.

Testimony was also admitted from another inmate, William Clark ("Clark"), who had served for 23 years as a police officer but was being held for a sex offense against a family member. While both men were incarcerated at the jail, Clark assisted petitioner, who could not read or write, by reading legal documents to him and explaining the terms contained therein. Clark mentioned that bite marks had been found on the breasts of the victim, and petitioner acknowledged that they belonged to him. In regard to the reports concerning the DNA analysis, Clark informed petitioner that petitioner's DNA and another man's DNA had been found under Sayle's fingernails. Clark testified that petitioner was not surprised by the presence of his own DNA, but was surprised that another individual's DNA had been found. Petitioner then stated that he thought he knew to whom it belonged, a man at the club that he had seen with Sayle. T. 339-345.

Sayle's close friend and co-worker Thressa Brado ("Brado") testified that Sayle wanted to end her relationship with petitioner around October of 2005. Sayle told Brado that she had begun to fear petitioner because he was "extremely jealous" and "would accuse her of sleeping with other men." T. 118-21. One week before the murder, Sayle told Brado that she was going to end the relationship that week, and wanted to move to North Carolina. Sayle, however, was "afraid of how [petitioner] would handle it," and wanted to get a restraining order. T. 121-23. However, Brado confirmed that Sayle picked up petitioner in her vehicle the Friday before her death. T. 123-24.

Similarly, another co-worker, Lisa Parker ("Parker") confirmed that Sayle wanted to end the relationship with petitioner, who was "very jealous" and suspicious of other men. T. 111-13, 115. According to Parker, sometime after Christmas of 2005, Sayle had tried to end her relationship with the petitioner, but he continued to call her several times a day. T. 115-16. He would also "come around" frequently, which caused Sayle to become afraid. T. 116.

In November of 2005, Sayle told her sister, Jane Williams, that she wanted to end the relationship with petitioner, but was having difficulty doing so because she felt sorry for him. T. 31, 36. Nonetheless, Sayle continued to see petitioner socially. T. 275, 278-280. Sayle later told her sister that she had broken up with petitioner after New Year's, but petitioner still continued

to call her "all the time," and Sayle was "afraid he might show up" unexpectedly at her home. T. 32-33, 40.

Finally, the prosecution also called two of petitioner's former girlfriends to testify. Nancy Rookey, who had lived with petitioner for about six years, testified that petitioner was prone to jealousy, and would often "fly off the handle" and "get in your face." She also testified that petitioner never physically abused her during their relationship. T. 359-61. Bernice Law ("Law") dated petitioner for less than a year. After they broke up, she told petitioner that she "just wanted to be friends." On one occasion after their breakup, however, she recounted that petitioner had forced himself on her, and while she struggled to free herself, petitioner "start[ed] to choke" her, placing his hands over her throat and mouth. Law ultimately gave in to petitioner's sexual demands, knowing that she "couldn't win." Other than that incident, Law testified that their sexual relations had always been consensual and non-violent. T. 365-68.

At the close of the prosecution's case, defense counsel moved for a trial order of dismissal based on a claim of legally insufficient evidence as to intent and the cause of death. The trial court reserved decision. T. 369-74.

### 2. The Defense

The defense called two witnesses at trial. The first, a forensic pathologist, testified that while he agreed with the

factual findings of the coroner, he believed that the most probable cause of death was an "acute coronary event," given that the victim was a heavy smoker, had high blood pressure, an enlarged heart, a family history of coronary artery disease, and had 80 to 85% blockage of her coronary arteries. T. 383-92, 420. He concluded that while suffocation was a possible cause of death, it was his opinion that it was a "very unlikely one." T. 392-93.

The second witness called was Joanne Clark, a woman who dated petitioner and lived with him from 1996 to 2003. She testified that petitioner was not jealous or possessive, and had never hurt her. T. 434-35.

Following the defense's evidence, petitioner renewed his motion for a trial order of dismissal. The court reserved decision. T. 439-40.

### 3. Verdict and Sentence

Although neither the prosecution nor petitioner requested consideration of lesser-included offenses, the court stated that it would consider the following charges: first- and second-degree manslaughter, and criminally negligent homicide. Following summations, the court adjourned the matter until August 9, 2006, when it returned its verdict. A 19-page written decision was issued in which the court found petitioner not guilty of second-degree murder and guilty of the lesser-included offense of first-degree manslaughter. <u>See</u> Resp't Exhibits ("Ex.") A at 5-23. The court

concluded that, while there was compelling circumstantial evidence that petitioner engaged in a "physical, violent sexual, or attempted sexual encounter" with the victim, during which he caused her death by asphyxiation, there was reasonable doubt as to whether petitioner "formed an intent to cause death." Ex. A at 22.

Petitioner was then sentenced as a second felony offender to a determinate term of 25 years in prison followed by five years of post-release supervision. S. 26.

## B. Direct Appeal

Petitioner appealed his conviction to the Appellate Division, Fourth Department, raising four points: (1) the trial court erred by admitting the hearsay testimony of the victim's sister and two of her former friends and co-workers; (2) the trial court erred by admitting the testimony of two of petitioner's former girlfriends; (3) trial counsel was ineffective for failing to establish that the victim was not with petitioner the night of the murder and for failing to conduct a <u>Cardona</u> hearing; and (4) the evidence was insufficient and the verdict was against the weight of the evidence. Ex. B. The Appellate Division unanimously affirmed the judgement of conviction. <u>People v. Wise</u>, 46 A.D.3d 1397 (4th Dept. 2007), <u>lv. denied</u>, 10 N.Y.3d 872 (2008); Ex. E, H.

## C. Petition for Habeas Corpus

On February 5, 2009, petitioner filed an amended petition stating four grounds for habeas relief, incorporating his brief on

direct appeal (Dkt. #12). <u>See</u> Amended Petition dated 2/5/2009 ("Am. Pet."). Shortly thereafter, he filed an additional document that set forth four claims, substantially similar to those raised to the Appellate Division and the New York Court of Appeals (Dkt. #14). <u>See</u> Second Amended Petition dated 2/26/2009 ("2d Am. Pet."). Liberally construed, both documents, can be read to allege the following four grounds for habeas relief: (1) petitioner was denied a fair trial when the court admitted the hearsay statements of Sayle's sister and two friends; (2) the testimony of petitioner's ex-girlfriends was prejudicial, depriving petitioner of a fair trial; (3) his trial counsel was constitutionally ineffective; and (4) the evidence was legally insufficient and the verdict was against the weight of the evidence.

For the reasons that follow, I find that petitioner is not entitled to the writ, and the petition is dismissed.

## III. Discussion

### A. General Principles Applicable to Federal Habeas Review

#### 1. Standard of Review

To prevail under 28 U.S.C. § 2254, as amended in 1996, a petitioner seeking federal review of his conviction must demonstrate that the state court's adjudication of his federal constitutional claim resulted in a decision that was contrary to or involved an unreasonable application of clearly established Supreme Court precedent, or resulted in a decision that was based on an

unreasonable factual determination in light of the evidence presented in state court. See 28 U.S.C. § 2254(d)(1), (2); Williams v. Taylor, 529 U.S. 362, 375-76 (2000).

**B.  Merits of the Petition**

    **1.  Claims One and Two: Evidentiary Issues**

        **a.  Hearsay Testimony of the Victim's Sister and Friends**

Petitioner claims that the hearsay statements and testimony of the victim's sister and her friends/co-workers was so prejudicial that it deprived petitioner the right to a fair trial. See 2d Am. Pet. at 1; Ex. B at 11-20. Specifically, petitioner alleges that the statements of Sayle, indicating that she had broken up with petitioner and feared for her safety because of his jealous tendencies, should not have been admitted. Id. The Appellate Division rejected this contention on the merits, "[e]vidence of the victim's state of mind is highly probative of, inter alia, defendant's motive, as long as it can be shown that defendant was aware of the same, and here, the People established that defendant was aware of the victim's state of mind." Wise, 46 A.D.3d at 1398 (internal quotation and citation omitted).

It is well-settled that a state court's evidentiary rulings, even if erroneous under state law, do not generally present constitutional issues cognizable on federal habeas review. See Crane v. Kentucky, 476 U.S. 683, 689 (1986). To warrant habeas review of a state court's erroneous evidentiary ruling, a

petitioner must show that the error was "so pervasive as to have denied [petitioner] a fundamentally fair trial." <u>Collins v. Scully</u>, 755 F.2d 16, 18 (2d Cir. 1985).

Petitioner has failed to demonstrate an error of state law, much less a violation of constitutional magnitude. "The general rule in New York that an out-of-court statement is admissible if it is not admitted for the truth of the matter stated, but for another purpose." <u>Soto v. Greiner</u>, 02 Civ. 2129, 2002 WL 1678641 at *10 (S.D.N.Y. July 24, 2002) (citing New York case law). Where, as here, a hearsay statement that is probative of the victim's state of mind as it relates to the state of her relationship, may be admissible as probative of the defendant's motive for killing her. <u>People v. Rose</u>, 41 A.D.3d 742 (2nd Dept. 2007); <u>see also</u> <u>People v. Bierenbaum</u>, 301 A.D.2d 119 (1st Dept. 2002) (in a circumstantial murder case involving domestic violence, the trial court properly allowed several prosecution witnesses to testify about the victim's verbal statements to them describing defendant's threatening remarks and otherwise negative behavior, including a prior choking incident, in order to explain the state of the parties' marriage and state of mind); <u>People v. Williams</u>, 29 A.D.3d 1217 (3rd Dept. 2006) (holding that the trial court did not abuse its discretion in permitting evidence of defendant's prior abusive, controlling and threatening behavior toward victim as it provided necessary

background information as to their relationship and also bore on motive and intent).

Similarly, Sayle's statements to her sisters and friends regarding her intent to break up with petitioner were also admissible as evidence of her future intent. "The state of mind of the victim is only relevant if it can be shown that defendant was aware of same. Only under such circumstances would proof of the victim's mental processes and, in particular, her plan to forsake defendant . . . assist in establishing a motive for the killing." People v. Wlasiuk, 32 A.D.3d 674 (3rd Dept. 2006); see also People v. Kimes, 37 A.D.3d 1 (1st Dept. 2006). The trial court thus properly concluded that the testimony at issue established that Sayle "intended to terminate the relationship with [petitioner] and also reported that he was jealous of her." Ex. A at 19. In any event, in the context of a bench trial, "the factfinder knows the purpose for which evidence is admitted and is presumed to rest his verdict on the proper inferences drawn from such evidence." United States v. Duran-Colon, 252 Fed.Appx. 420, 426 (2d Cir. 2007); accord Harris v. Rivera, 454 U.S. 339, 346 (per curiam) ("In bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions.")

Accordingly, because the admission of the hearsay statements was not erroneous under state law, petitioner has not alleged a constitutional violation. See Green v. Herbert, No. 01CIV.11881,

2002 WL 1587133, at *12 (S.D.N.Y. Jul. 18, 2002) ("The first step in this analysis is to determine whether the state court decision violated a state evidentiary rule, because the proper application of a presumptively constitutional state evidentiary rule would not be unconstitutional.") (citing Brooks v. Artuz, 97 Civ. 3300, 2000 WL 1532918 at *6, 9 (S.D.N.Y. Oct. 17, 2000) (petitioner did not demonstrate an error under state evidentiary law, "much less" an error of constitutional magnitude); Jones v. Stinson, 94 F.Supp.2d 370, 391-92 (E.D.N.Y.) (once the habeas court has found that the state court ruling was not erroneous under state law, there is no need to apply a constitutional analysis), rev'd on other grounds, 229 F.3d 112 (2d Cir. 2000)). This claim, therefore, must be dismissed.

### b.    Evidence of Prior Bad Acts

Petitioner next contends that the testimony of his two former girlfriends was irrelevant, "more prejudicial than probative," and denied petitioner of due process and a fair trial. 2d Am. Pet. at 2; Ex B. at 21-27. The testimony involved the alleged prior bad acts of petitioner, including attempted asphyxiation and forcible sexual intercourse. The Appellate Division held that the testimony was "probative of defendant's identity, motive and intent and was therefore properly admitted in evidence. In any event, any error with respect to the admission of that testimony is harmless because, in a nonjury trial, the court is presumed to be capable of

disregarding any improper or unduly prejudicial aspect of the evidence." Wise, 46 A.D.3d at1399 (citations omitted).

Because the United States Supreme Court has declined to determine whether use of uncharged crimes would violate due process, the Appellate Division's rejection of petitioner's argument cannot be considered an unreasonable application of clearly established Supreme Court precedent. See Jones v. Conway, 442 F.Supp.2d 113 (S.D.N.Y. 2006) (citing Estelle v. McGuire, 502 U.S. 62, n.5 (1991). Moreover, "[a] decision to admit evidence of a criminal defendant's uncharged crimes or bad acts under Molineux[2] constitutes an evidentiary ruling based on state law." Sierra v. Burge, 06 Civ. 14432, 2007 WL 4218926, *5 (S.D.N.Y. Nov. 30, 2007). As such, state court Molineux rulings are generally not cognizable on habeas review. See Roldan v. Artuz, 78 F.Supp.2d at 276 (S.D.N.Y. 2000). As stated above, "[i]n order to prevail on a claim that an evidentiary error deprived the defendant of due process under the Fourteenth Amendment he must show that the error was so pervasive as to have denied him a fundamentally fair trial." Collins v. Scully, 755 F.2d at 18. Petitioner's claim falls short of establishing an error under state law, and he thus cannot establish that his constitutional rights were violated by the trial court's evidentiary ruling.

---

[2]

People v. Molineux, 168 N.Y. 264 (1901) ((prosecution may present evidence of a defendant's prior uncharged criminal or immoral acts for limited purposes, including to prove motive, identity, and intent).

Under New York law, evidence that a defendant committed similar uncharged crimes is generally excluded "because it may induce the jury to base a finding of guilt on collateral matters or to convict a defendant because of his past." People v. Alvino, 71 N.Y.2d 233, 241-42 (1987). The trial court may admit such evidence, however, "if it helps to establish some element of the crime under consideration or is relevant because of some recognized exception to the general rule." Id. "[E]vidence of uncharged crimes may be relevant to show (1) intent, (2) motive, (3) knowledge, (4) common scheme or plan, or (5) identity of the defendant. The list, of course, is not exhaustive." Id. The evidence will be allowed so long as its probative value outweighs the potential for prejudice to the defendant. Id. at 242, see also United States v. Sappe, 898 F.2d 878, 880 (2d Cir.1990).

Here, the trial court found that the testimony from Law and Rookey established that: (1) the petitioner's "prior relationship with several women was marked by jealousy;" and (2) "[o]ne such prior relationship culminated in forcibly compelling the woman to engage in sexual relations after [petitioner] had placed his hand on her neck and other hand over her mouth." Ex. A at 19. Similar evidence is commonly found relevant and admissible under state law so long as it is admitted to show, as here, identity, motive, and intent. See People v. Doyle, 48 A.D.3d 961 (3d Dept. 2008) (in murder case, trial court properly admitted evidence "concerning

specific instances of defendant's threatening and controlling behavior toward the victim, as well as his threatening and assaultive behavior toward two former girlfriends which resulted in convictions"); see also Walker v. Phillips, No. 03 Civ. 1210 (TPG) 2008 WL 3833255, *4 (S.D.N.Y. Aug. 15, 2008) (holding that "the state court admitted [evidence of prior stabbings by petitioner] for lawful reasons, rather than for the improper purpose of showing propensity.").

"[I]n light of the broad discretion afforded trial courts in making evidentiary rulings on relevance and probative value," petitioner has simply failed to establish that the trial court's ruling was erroneous, let alone that the Appellate Division's affirmance was contrary to, or an unreasonable application of Supreme Court precedent. Ojar v. Greene, No. 07-CV-3674 (JG), 2008 WL 428014, *8 (E.D.N.Y. Feb. 15, 2008). Accordingly, this claim is dismissed.

### 2. Claim Three: Ineffective Assistance of Trial Counsel

Petitioner next avers that he was denied the effective assistance of counsel because his attorney failed to prove that the victim was not with petitioner on the night of January 21, 2003, and also failed to request a Cardona[3] hearing. 2d Am. Pet. at 3;

---

[3] A Cardona hearing is held to determine whether an inmate informant who testifies that a confession was made by a defendant while in jail was an agent of the government; where the informer "works independently of the prosecution, provides information on his own initiative, and the government's role is limited to the passive receipt of such information, the informer is not, as a

Ex. B. at 28-32. The Fourth Department rejected this contention on
the merits:

> The record establishes that defense counsel
> addressed all pretrial matters in a proper
> manner and presented a cogent defense that the
> victim died of natural causes. The victim was
> found deceased in her home and, although the
> medical examiner testified that the victim
> died of asphyxia, defense counsel presented
> countervailing expert testimony indicating
> that the victim had actually died of severe
> coronary artery disease caused by a lifetime
> of heavy smoking and obesity, that she had a
> family history significant for heart disease,
> and that none of her injuries caused her
> death. Viewing the evidence, the law, and the
> circumstances of the case as a whole and as of
> the time of the representation, we conclude
> that defendant was afforded meaningful
> representation.

Wise, 46 A.D.3d at 1399 (citation omitted).

To establish that he was deprived of his Sixth Amendment right
to the effective assistance of trial counsel, a petitioner must
show that (1) his attorney's performance was deficient, and that
(2) this deficient performance prejudiced his defense. Strickland
v. Washington, 466 U.S. 668, 687 (1984). Deficiency is measured by
an objective standard of reasonableness, and prejudice is
demonstrated by a showing of a "reasonable probability" that, but
for counsel's unprofessional errors, the result of the trial would
have been different. Id. at 694. "A reasonable probability is a
probability sufficient to undermine confidence in the outcome of

matter of law" an agent of the government. People v. Cardona, 41 N.Y.2d 333,
335(1977); see also Massiah v. United States, 377 U.S. 201, 203-04(1964).

the proceeding." Id. To succeed, a petitioner challenging counsel's representation must overcome a "strong presumption that [his attorney's] conduct falls within the wide range of reasonable professional assistance." Id. at 689. A reviewing court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct," id., and may not second-guess defense counsel's strategy. Id. at 690. Here, petitioner has failed to demonstrate that his counsel's conduct was deficient within the meaning of Strickland, and that, but for the deficiency, the result of his trial would likely have been different.

First, petitioner's bare allegation that counsel "failed to prove that the decedent was not with the petitioner on Saturday night," see 2d Am. Pet. at 3, is entirely conclusory and thus cannot support a claim of ineffective assistance of trial counsel. He does not set forth any facts to that explain someone "other than the petitioner had the opportunity" to cause the victim's death, nor does he discuss where such evidence would have come from. Absent some indication of what particular evidence counsel failed to offer, this claim is too vague to form a basis for habeas relief. See McPherson v. Greiner, No. 02 Civ.2726 DLC AJP, 2003 WL 22405449, *25 (S.D.N.Y. Oct.23, 2003) ("[Petitioner]'s claims that trial counsel was ineffective for failing to investigate are conclusory and give no indication as to what exculpatory evidence

a proper investigation would have revealed, or how such evidence would have benefitted [petitioner]'s case."); Vasquez v. United States, No. 96 CIV. 2104(PKL), 1996 WL 694439, at *7 (S.D.N.Y. Dec.3, 1996) (dismissing ineffective assistance claim where petitioner's "allegations [we]re vague, conclusory, and unsupported by citation to the record, any affidavit, or any other source; finding that "[t]he vague and unsubstantiated nature of the claims do not permit the Court to conclude that the charged errors reflect performance falling below an objective standard of reasonableness or that but for the errors the result would have been different.").

Petitioner's argument that his attorney erred in failing to seek a Cardona hearing with respect to four jailhouse informants is equally without merit. See 2d Am. Pet. at 3; Ex. B at 28-32.[4] "The mere fact that certain pretrial motions were not made does not, by itself, indicate ineffective assistance of counsel." Morgan v. Ercole, No. CV-06-3716 (CBA), 2009 WL 3805309, *5 (E.D.N.Y. Nov. 12, 2009) (citing People of State of New York v. Torrence, 135 A.D.2d 1075 (4th Dept. 1987)); see, e.g., LiPuma v. Comm., Dept. of Corr., 560 F.2d 84, 93 (2d Cir.), cert. denied, 434 U.S. 861 (1977) ("defense counsel is not required automatically to file a suppression motion in every case involving evidence or statements obtained after a search; rather, counsel must use 'professional

---

[4] Although four inmates testified, the trial court disregarded the testimony of two of those inmates as not credible. Ex. A at 11-12 n.1, 18 n.2.

discretion in deciding whether there are sufficient grounds' for such a motion."); see also People v. Garcia, 75 N.Y.2d 973, 975 (1990). Rather, "[t]o prevail on a claim of ineffective assistance of counsel, it is incumbent upon the defendant to demonstrate the absence of strategic or legitimate explanations  for counsel's failure to request a particular hearing. Absent such a showing, it will be presumed that counsel acted in a competent manner and exercised professional judgment in not pursuing a hearing." Mohamed v. Portuondo, No. 97-CV-3735(JBW), 2004 WL 884072, *9 (E.D.N.Y. March 11, 2004).

Here, petitioner has not attempted to show how the two inmate witnesses (Clark and Lotz) were acting as agents of the state, or that a Cardona hearing would have revealed such evidence. There is nothing in the record to suggest that either inmate was approached by law enforcement before the conversations occurred. Accordingly, he cannot establish that counsel's performance was deficient for failing to request a Cardona hearing, and this claim must therefore be dismissed. See Ferrara v. Keane, 806 F. Supp. 472, 477 (S.D.N.Y. 1992) (denying ineffective assistance of counsel claim where petitioner failed to show that "the Massiah-Cardona hearing would have succeeded in revealing [the witness] as an agent of the state"); accord, McCrone v. Brown, No. 07-cv-00077-JKS, 2008 WL 724234, *6 (N.D.N.Y. March 17, 2008) ("There was no basis for a

<u>Cardona</u> hearing . . . consequently, counsel's performance could hardly be termed deficient for failing to request one.").

### 3. Claim Four: Sufficiency and Weight of the Evidence

Petitioner claims that the verdict was against the weight of the evidence and was also based on insufficient evidence because the prosecution failed to establish that petitioner "intended to cause the decedent serious physical injury and caused her death." 2d Am. Pet. at 4-7; Ex. B at 33-43. The Appellate Division rejected both claims on the merits:

> Contrary to the further contention of defendant, the evidence is legally sufficient to establish the element of intent to cause serious physical injury to the victim. That intent may be inferred from defendant's conduct, the surrounding circumstances, and the medical evidence. Here, the medical evidence indicated that defendant and the victim engaged in a struggle prior to her death that resulted in blunt force injuries to parts of her body and injuries to her eyes and mouth. The victim also suffered injuries indicating that pressure had been applied to her mouth that led to her asphyxia. Additionally, we reject defendant's contention that the verdict is against the weight of the evidence, particularly in view of the statement of defendant that he drove the victim to work on the same day that her decomposing body was found, and the additional extensive circumstantial evidence presented by the People.

<u>Wise</u>, 46 A.D.3d at 1399-1400 (internal quotations and citations omitted).

On the outset, challenges to the weight of the evidence supporting a conviction, unlike challenges to the sufficiency of

the evidence, are not cognizable on federal habeas review. <u>Maldonado v. Scully</u>, 86 F.3d 32, 35 (2d Cir. 1996). A claim that a verdict was against the weight of the evidence derives from N.Y. Crim. Proc. L. § 470.15(5), which permits an appellate court in New York to reserve or modify a conviction where it determines "that a verdict of conviction resulting in a judgment was, in whole or in part, against the weight of the evidence." N.Y. Crim. Proc. L. § 470.15(5). Thus, the "weight of the evidence" argument is a pure state law claim grounded in the criminal procedure statute, whereas a legal sufficiency claim is based on federal due process principles. <u>People v. Bleakley</u>, 69 N.Y.2d 490, 495 (1987). Since a weight of the evidence claim is purely a matter of state law, it is not cognizable on habeas review. <u>See</u> U.S.C. § 2254(a); <u>Estelle v. McGuire</u>, 502 U.S. 62, 68 (1991) ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").

In addition, petitioner's sufficiency of the evidence claim fails on the merits. A petitioner challenging the sufficiency of the evidence of his guilt in a habeas corpus proceeding "bears a very heavy burden." <u>Fama v. Comm. of Corr. Services</u>, 235 F.3d 804, 813 (2d Cir. 2000). Habeas corpus relief must be denied if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson</u>

v. Virginia, 443 U.S. 307, 319 560 (1979) (emphasis in original). This sufficiency-of-evidence "inquiry does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." Herrera v. Collins, 506 U.S. 390, 402 (1993). Stated another way, the reviewing court must determine "whether the jury, drawing reasonable inferences from the evidence, may fairly and logically have concluded that the defendant was guilty beyond a reasonable doubt ... view[ing] the evidence in the light most favorable to the government, and constru[ing] all permissible inferences in its favor." United States v. Carson, 702 F.2d 351, 361 (2d Cir.1983) (internal citations omitted), cert. denied sub nom. Mont v. United States, 462 U.S. 1108 (1983). A federal court reviewing an insufficiency-of-the-evidence claim must look to state law to determine the elements of the crime. Quartararo v. Hanslmaier, 186 F.3d 91, 97 (2d Cir.1999) (citation omitted), cert. denied, 528 U.S. 1170 (2000).

The New York Penal Law provides that a person commits first-degree manslaughter when, "[w]ith intent to cause serious physical injury to another person, he causes the death of such person . . . . " N.Y. Penal L. § 125.20(1). "Serious physical injury" is defined as "physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement,

protracted impairment of health, or protracted loss or impairment of the function of any bodily organ." N.Y. Penal L. § 10.00(10).

Viewing the evidence in the light most favorable to the prosecution, and drawing all permissible inferences in its favor, a rational finder of fact could have found the elements of first-degree manslaughter had been established beyond a reasonable doubt. The evidence presented at trial can be summarized as follows: (1) petitioner's prior relationships with women were marked by jealousy, and that petitioner had forced a former girlfriend to engage in sexual relations after he placed his hand on her neck and his hand over her mouth; (2) petitioner made over forty phone calls to Sayle at her residence and her place of employment in the weeks preceding her death; (3) petitioner and Sayle had argued on Saturday evening, January 21, 2006; (4) petitioner was observed by other bar patrons closely watching Sayle playing pool with other men on Saturday, January 21, 2006 at the Powers Inn Club; (5) Sayle was last seen alive leaving the Powers Club Inn on Saturday, January 21, 2006, with petitioner; (6) she died of asphyxiation sometime thereafter, no later than January 22, 2006, and the asphyxiation was intentional; (7) Sayle had multiple injuries about her face and body, caused by external force and not accidental in nature; (8) Sayle's body was unclothed at the time of her death; petitioner admitted covering her body with a comforter; (9) her body contained DNA from petitioner and an unknown male, and

petitioner was "not surprised" by the presence of his DNA; (10) petitioner admitted that bite marks on Sayle's breasts belonged to him; (11) a fresh scratch was observed on petitioner's hip the morning of January 24, 2006, when he was being booked at the Livingston County Jail; (12) among other inconsistencies in petitioner's story, he falsely told Sheriff's Deputies that he had taken Sayle to work the morning of January 23, however Sayle was already deceased on the morning of January 23, 2006; and (13) petitioner returned to the Powers Inn Club on the morning of January 23 and told another patron that he had "something to do" on Saturday evening, he did it, and could not tell her what it was and not to ask about it.

Here, the record demonstrates that there was sufficient evidence to support petitioner's conviction. The fact that the trial judge, sitting as the fact-finder in this case, rejected petitioner's alternative theory that the victim suffered a fatal heart attack that caused her to fall, does not render the evidence insufficient. See Santos v. Zon, 206 F. Supp. 2d 585, 589-90 (S.D.N.Y. 2002). Accordingly, the Appellate Division's rejection of petitioner's legally insufficiency claim was not contrary to, or based on an unreasonable application of Jackson v. Virginia. This claim is therefore denied.

**IV.  Conclusion**

For the reasons stated above, William J. Wise's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the action is dismissed.  Because petitioner has failed to make a "substantial showing of a denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability.  See, e.g., Lucidore v. New York State Div. of Parole, 209 F.3d 107, 111-113 (2d Cir. 2000).  The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and therefore denies leave to appeal as a poor person.  Coppedge v. United States, 369 U.S. 438 (1962).

**SO ORDERED.**

S/Michael A. Telesca

_____
                    MICHAEL A. TELESCA
                    United States District Judge

Dated:      October 7, 2010
            Rochester, New York